**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                                        Plaintiff,

                v.

CONVERGYS CORPORATION, and CONVERGYS
CUSTOMER MANAGEMENT GROUP, INC.,

                                        Defendants.

---

Index No. _____/2012

Date Purchased:

**SUMMONS**

Pursuant to CPLR § 503, the
basis of venue is that Plaintiffs
designated New York County.

To the above-named defendants:

        YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys,

at the address stated below, an answer to the attached complaint within twenty (20) days after the

service of this summons, exclusive of the day of service, or within thirty days (30) after the service

is complete if this summons is not personally delivered to you within the State of New York; upon

failure to answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Dated: New York, NY
        November 20, 2012

                        SIMPSON THACHER & BARTLETT LLP

                        By _____

                        Mary Kay Vyskocil
                        Bryce L. Friedman
                        Meghan E. Cannella
                        425 Lexington Avenue
                        New York, New York 10017-3954
                        Telephone: (212) 455-2000
                        Facsimile: (212) 455-2502
                        mvyskocil@stblaw.com
                        bfriedman@stblaw.com
                        mcannella@stblaw.com
                        *Attorneys for Plaintiff Certain Underwriters at*
                        *Lloyd's, London*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON,

                                        Plaintiff,

        v.

CONVERGYS CORPORATION, and CONVERGYS
CUSTOMER MANAGEMENT GROUP, INC.,

                                        Defendants.

Index No. _____/2012

## COMPLAINT

Plaintiff Certain Underwriters at Lloyd's, London, Syndicates 623 and 2623

("Beazley") subscribing to Technology, Media & Professional Liability Insurance Policy number

QK1102774 (the "Policy"), state by way of a Complaint for Declaratory Judgment against

defendants Convergys Corporation and Convergys Customer Management Group, Inc.

("CCMG" and together, "Convergys") as follows:

## NATURE OF THE ACTION

1.        This is an action seeking a declaratory judgment that Beazley does not owe

insurance coverage to Convergys.  In January 2012, CCMG was sued by Nicholas Martin on

behalf of a putative class of plaintiffs who were allegedly the subject of unlawful telemarketing

and violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et. seq.* ("TCPA") by

CCMG.  On August 21, 2012, a class was certified.  The plaintiff class does not claim personal

injury, property damage, or seek to recover any damages from CCMG.   Instead, the plaintiff

class seeks to impose statutory penalties on CCMG pursuant to the TCPA.  The plaintiff class

seeks penalties of $500 per unlawful phone call by CCMG, or $1,500 per unlawful phone call if

violation of the TCPA is found to be willful.

2.       By this action Beazley seeks a declaratory judgment pursuant to New York Civil Practice Law and Rules § 3001 that the Policy does not cover the cost of defending, settling or paying a judgment in Mr. Martin's lawsuit.

## PARTIES

3.       Beazley is licensed to issue insurance policies by the State of New York and has conducted continuous and substantial business in the State of New York and the County of New York.  Beazley's office is located in New York County.

4.       Defendants are corporations that are authorized to transact business in the State of New York and/or conducted continuous and substantial business in the State of New York and the County of New York.  Defendant Convergys Corporation is a corporation whose stock is traded on the New York Stock Exchange in New York County.  Defendant Convergys Corporation and its subsidiary, defendant Convergys Customer Management Group, Inc., claim to be insured under the Policy.  Defendants made the claim for coverage under the Policy at issue in this case in New York County.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over the parties and the subject matter pursuant to C.P.L.R. §§ 301 and 302 because the parties have transacted continuous and substantial business in the State of New York and the County of New York.

6.        Venue is proper pursuant to C.P.L.R.  §§ 503(a), (c) because Beazley's office is located in the County of New York.

## FACTUAL BACKGROUND

**A.**        **The Policy**

7.        Plaintiff issued the Policy to Convergys for the period August 1, 2011 to August 1, 2012.  A true and correct copy of the Policy is attached hereto as Exhibit A.

8.        The Policy is a non-standard contract that was negotiated by Convergys.

9.        In general, subject to all of its terms, conditions and exclusions, the Policy provides insurance coverage to Convergys for professional and technology services provided by Convergys as well as for multimedia and advertising liability.

10.        Beazley has no duty to defend under the Policy.  Under the Policy, it "shall be the duty of the Insured and not the duty of [Beazley] to defend Claims."

11.        The named insured under the Policy is Defendant Convergys Corporation.  The Policy contains a $1 million deductible for each and every claim.  With certain limited exceptions, the Policy provides for a $20,000,000 limit of liability for each claim, and a $20,000,000 aggregate limit of liability.

12.        Claims by Convergys under the Policy are to be reported to Beazley's New York office.  The Policy provides that "any dispute concerning the interpretation of the terms, conditions, limitations and/or exclusions contained in [the Policy]" is to be governed by New York law.

**B.**        **The *Martin* Action**

13.        On January 11, 2012, Nicholas Martin initiated a putative class action against Convergys Customer Management Group, Inc. and Dun & Bradstreet, Inc. ("D&B") in the United States District Court for the Northern District of Illinois (the "*Martin* Action").  A true and correct copy of the operative complaint in the *Martin* Action is attached hereto as Exhibit B.

14.     Mr. Martin's complaint asserts, on behalf of himself and a proposed class, a single cause of action against CCMG and D&B for unlawful telemarketing.  Mr. Martin alleges that CCMG violated the TCPA by making "improper and unsolicited autodialed calls" to his cellular telephone.  Mr. Martin alleges that CCMG unlawfully used an automatic telephone dialing system ("ATDS") to make calls to him and the class, and that the calls were made on behalf of and with the authorization of D&B.  Mr. Martin does not allege any breach or violation of any other laws, regulations, rules or policies.

15.     Mr. Martin seeks, on behalf of himself and the class, injunctive relief and statutory penalties of $500 per violation, or up to $1,500 per violation, if the defendants' actions prove to be willful.  Mr. Martin does not seek damages for any actual monetary loss.

**C.      The Instant Insurance Coverage Dispute**

16.     By letter dated January 25, 2012, Aon, the insurance broker for Convergys Corporation, notified Beazley's New York office of the *Martin* Action and tendered the claim for insurance coverage under the Policy.

17.     Beazley acknowledged receipt of the claim and, after considering the information about the *Martin* Action provided by Convergys, determined that there was no coverage under the Policy.  Beazley invited Convergys to provide additional information.

18.     Convergys submitted addition information by letter dated June 7, 2012.  After evaluating and considering that information, Beazley requested additional information and, by letter dated June 22, 2012, reserved its rights to later amend, modify or supplement its coverage position in light of additional facts or information.  Convergys has not provided the information requested.

19.        By letter dated October 9, 2012, Convergys Corporation advised Beazley that the United States District Court for the Seventh Circuit referred the *Martin* Action to mediation. Convergys Corporation requested that Beazley "participate meaningfully in the mediation."

20.        The Policy contains terms and conditions that must be satisfied for losses incurred by Defendants to come within the scope of its coverage.  As fully set forth in the Policy, coverage is not available for the *Martin* Action.

21.        By way of example and without limiting the terms, conditions and exclusions of the Policy:

        a.  Exclusion K of the Policy provides that there is no coverage for actual or alleged violations of consumer protection laws, such as the Telephone Consumer Protection Act.  No exception to the exclusion applies here.  Therefore, the Policy does not provide coverage for the *Martin* Action, which concerns alleged violations of the TCPA.

        b.  Exclusion V of the Policy provides that there is no coverage for claims arising from telemarketing.  No exception to the exclusion applies here.  Therefore, the Policy does not provide coverage for the *Martin* Action, which arises from telemarketing.

        c.  The Policy provides coverage for damages, not penalties.  Therefore, the Policy does not provide coverage for the *Martin* Action, which seeks to impose statutory penalties on CCMG and does not seek damages.

22.        To date, Convergys has not sought reimbursement of any "Claims Expenses" under the Policy.

23.     To date, Beazley has not refused to reimburse any "Claims Expenses" sought by Beazley under the Policy.

24.     Defendants have not satisfied each and every term and condition of the Policy.

25.     Defendants' losses are barred by the exclusions set forth in the Policy.

26.     Any coverage under the Policy is also subject to the applicable deductible, retrospective premiums, retentions, limits of liability and provisions regarding other insurance coverage.

## COUNT I
### (Declaratory Judgment)

27.     Beazley repeats and realleges paragraphs 1-26 of the Complaint as if set forth fully herein.

28.     An actual, ripe and justiciable controversy exists between Beazley and Convergys regarding the parties' respective rights and obligations under the Policy.

29.     Beazley is entitled to a declaration that based on all of its terms, conditions and exclusions, the Policy provides no coverage for the *Martin* Action and Beazley has no obligation to provide insurance coverage for the *Martin* Action.

## PRAYER FOR RELIEF

WHEREFORE, Beazley prays for judgment (a) declaring that the Policy provides no coverage for the *Martin* Action, (b) declaring that Beazley has no obligation to provide coverage for the *Martin* Action, (c) awarding Beazley attorneys' fees, costs and other expenses; and (d) awarding Beazley such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: New York, NY
       November 20, 2012

SIMPSON THACHER & BARTLETT LLP

By: _____

    Mary Kay Vyskocil
    Bryce L. Friedman
    Meghan E. Cannella
    425 Lexington Avenue
    New York, New York 10017-3954
    Telephone: (212) 455-2000
    Facsimile: (212) 455-2502
    mvyskocil@stblaw.com
    bfriedman@stblaw.com
    mcannella@stblaw.com
    *Attorneys for Plaintiff Certain Underwriters at*
    *Lloyd's, London*

# EXHIBIT A

| POLICY NO: | | |
|---|---|---|
| QK1102774 | | **823** |
| RENEWING: | | **AON** |

| ASSURED/REASSURED: | **CONVERGYS CORPORATION** |
|---|---|
| | **- Prim USD20m (Beazley)** |

**AON** Aon Limited

| CLIENT: | |
|---|---|
| | **AON FINANCIAL SERVICES GROUP** |

| CLIENT BA CODE: | REINSURANCE NOS: |
|---|---|
| PPW DUE DATE: | |
| HERETO WRITTEN: | |
| TOTAL WRITTEN: | |
| INCEPTION DATE:   01 Aug 2011 | ORIGINAL EXPIRY DATE:   01 Aug 2012 |
| NO. OF SLIPS: | SIGNING % |

SIGNING NOS & DATES:

FOR X-CHANGING INS-SURE SERVICES USE

OTHER INFORMATION

AON USE ONLY

**AON** *Aon Limited*

**823**

**AON**

| POLICY NO: | QK1102774 | | REF NO: | | |
|---|---|---|---|---|---|
| CURRENCY | SIGNED LINE % | | GROSS PREMIUM: | | |
| USD | | | IN ALL | | |
| TOTAL | | | | | |
| LLOYD'S | | | | | |
| XIS (1) | | | | | |
| XIS (2) | | | | | |
| OTHER COMPANIES | | | | | |

| CURRENCY | SIGNED LINE % | | GROSS PREMIUM: | | |
|---|---|---|---|---|---|
| USD | | | IN ALL | | |
| TOTAL | | | | | |
| LLOYD'S | | | | | |
| XIS (1) | | | | | |
| XIS (2) | | | | | |
| OTHER COMPANIES | | | | | |

LPO208

**Policy Number:** QK1102774



## Schedule

| | |
|---|---|
| **Unique Market Reference** | B0823QK1102774 |
| **Type** | Technology, Media & Professional Liability Insurance |
| **Form** | PR488/05 based on AFB MEDIA TECH<br>Application Date: 6th July, 2011 |
| **Named Insured** | CONVERGYS CORPORATION |
| **Address of the Insured** | 201 East Fourth Street<br>Cincinnati<br>Ohio 45202<br>U.S.A. |
| **Policy Period** | From 1 August 2011<br>To 1 August 2012<br>12:01 a.m. Local Standard Time at the Address of the Insured shown above |
| **Interest** | Professional Liability |
| **Limit of Liability** | (A) USD20,000,000 Each Claim including Claims Expenses |
| | (B) USD20,000,000 in the aggregate |
| | 1) USD1,000,000 in the aggregate for all Privacy Notification Costs covered under Insuring Clause C.3 |
| | 2) USD1,000,000 in the aggregate for all Claims Expenses and Penalties covered under Insuring Agreement C.4 |
| **Deductible** | USD1,000,000 each and every Claim (including each Claim in the form of a Regulatory Proceeding) including Claims Expenses, expert for; |
| | USD5,000,000 each and every Claim arising from contracts with Johnson and Jonson, AT&T, DirecTV, Sprint, Yahoo!, US Postal Services, State of Florida, Comcast, AT&T Wireless and Cingular (solely with respect to former AT&T Wireless contracts) |
| | USD1,000,000 Each incident or series of connected incidents giving rise to an obligation to incur Privacy Notification Costs covered under insuring Clause C.3., with 20% co-insurance for credit monitoring costs |
| **Conditions** | As per form. |
| | Premium Payment Warranty - AFB Version - 623AFB00082<br>Number of days allowed for payment of Premium: 62 |
| | Nuclear Incident Exclusion Clause - Liability - Direct (Broad) - NMA1256 |

Policy Number: QK1102774    

Radioactive Contamination Exclusion Clause - Liability - Direct - NMA1477

War & Civil War Exclusion Clause - NMA464

Service Credits Endorsement - as attached.

Special Cancellation Clause - as attached.

Sanction Limitation and Exclusion Clause - as attached.

**Choice of Law and Jurisdiction**

Any dispute concerning the interpretation of the terms, conditions, limitations and/or exclusions contained in this policy is understood and agreed by both the (re)insured and the (re)insurers to be subject to the law of New York.

Each party agrees to submit to the jurisdiction of as per the Service of Suit Clause to comply with all requirements necessary to give such Court jurisdiction.

In respect of claims brought against the Insured and indemnified under this policy, as more fully described herein, the choice of law applicable is New York and the choice of jurisdiction is Service of Suit Clause.

**Premium**

USD540,000

**Tax(es) Payable by Assured and administered by Underwriters**

As per attached tax Spreadsheet - agreed by Underwriters.

**Payment Terms**

62 days Premium Payment Warranty - 623AFB00082

**Recording, Transmitting and Storing Information**

All documentation and information to be recorded and/or transmitted electronically and stored electronically in Aon Limited repositories.

**Territorial Limits**

Worldwide.

**Retroactive Date**

1st August, 2002 for Information Management Group
1st June, 1995 for Customer Management Group
14th January, 1991 for American Transtech, Inc
10th July, 1995 for AT&T UK Ltd. London
1st January, 1993 for AT&T Technopole 2000 France
1st Novemeber, 1993 for AT&T Transtech, Canada
16th February, 2000 for Encore Receivable Management Inc
1st April, 1998 for Ceon Corporation
11th December, 2001 for Intervoice

**Optional Extension Period**

12 months at 100% Additional Premium
24 months at 150% Additional Premium
36 months at premium to be determined

**Notice of Claim To**

Beth Diamond, Beazley Group, 1270 Avenue of the Americas, Suite 1200, New York, NY 10020, USA (tmbclaims@Beazley.com) and

Ian MacDonell, Aon Limited, 8 Devonshire Square, London, EC2M 4PL (agpclaims@aon.co.uk) - for information only.

**Policy Number:** QK1102774



| | |
|---|---|
| **Notice of Election** | Aon Financial Services Group, 200 E. Randolph Street, Chicago, Illinois 60601, U.S.A. |
| **Service of Suit** | Mendes & Mount, LLP, 750 Seventh Avenue, New York, N.Y. 10019-6829, U.S.A. |
| **Insurer Contract Documentation** | This document details the contract terms entered into by the insurer(s), and constitutes the contract document. |

**Policy Number:** QK1102774



OPEN MARKET SUBSCRIPTION AGREEMENT

| SLIP LEADER: | The Slip Leader is deemed to be AFB 623 / 2623 |
|---|---|
| BASIS OF AGREEMENT TO CONTRACT CHANGES: | General Underwriting Agreement (October 2001) with Professional Indemnity Schedule (May 2005). |
| BASIS OF CLAIMS AGREEMENT: | Claims to be managed in accordance with the Lloyd's 2006 Claims Scheme, (as applicable), or any successor scheme or agreement as may be agreed by the parties from time to time. In the event that insurers deny coverage, insurers (or their representative(s)) will, as soon as reasonably practicable, provide the reason(s) why coverage is denied, providing sufficient facts to allow the insured or the insured's agent to respond. |
| CLAIMS AGREEMENT PARTIES: | All claims to be agreed by the Slip Leader |
| CLAIMS ADMINISTRATION: | Aon Limited to enter claims advices into CLASS (as applicable Aon Limited will notify all claims agreement parties of any claim submitted to the policy, and give updates. Where possible/applicable, such notifications and updates will be given and administered via ECF and/or Aon Broking Connections Claims (Aon's claims repository). |
| RULES AND EXTENT OF ANY OTHER DELEGATED CLAIMS AUTHORITY: | None, unless otherwise specified here by any of the claim agreement parties shown above. |
| EXPERT(S) FEES COLLECTION: | Aon Ltd will not undertake the collection of any fee invoices rendered by third parties unless the fees form part of the insured's claim or the work is for the exclusive benefit of the insured. In the event of Aon not collecting third party fees the following applies (Slip Leader to elect as appropriate) The Leading Claims Agreement party (and the Leading Lloyd's Claims Agreement party where applicable) will determine the method of collection at the time of appointing any third party expert. |
| SETTLEMENT DUE DATE: | 01 / 10 / 2011 |
| BUREAUX ARRANGEMENTS: | Aon Limited to present de-linked signings to Xchanging Ins-Sure Services Ltd ("XIS") where considered appropriate. Premium payment requirements deemed met by presentation of premium/accounts to XIS or insurers hereon as applicable on or before the Settlement Due Date(s) ("SDD") which deemed to be in compliance with SDD and will not therefore be recorded as a late signing or payment. Where SDD or Premium Payment Warranty ("PPW") or Premium Payment Condition ("PPC") falls on a non-working day, presentation to XIS or insurers hereon as applicable on the next working day will be deemed in compliance with SDD, PPW or PPC. |

**Policy Number:** QK1102774

**AON**

---

| INFORMATION |
|:---:|

All information listed below is deemed seen, read and understood by Underwriters, in its entirety.

---

Policy Number: QK1102774 

**FISCAL AND REGULATORY**
**(USA, Direct – all other States)**

Tax(es) payable by
Underwriters:                    Tax Schedule – to be confirmed

Country of Origin:               U.S.A.

Overseas Broker:                 Aon Financial Services Group
                                 200 East Randolph Street
                                 Chicago
                                 Illinois 60601
                                 U.S.A.

Surplus Line Broker:             TBC

State of Filing:                 Ohio

Surplus Line Licence
Number:                          TBC

Surplus Line Broker
requirements:                    State Licensed Surplus Lines Agents only.
                                 (Not necessarily State-resident).

US Classification:               Surplus Line.

                                 (Note: US Classification will be LICENSED in respect of any
                                 incidental Kentucky locations).

Allocation of Premium to
Coding:                          E8

Allocation of Premium
To Year of Account:              Not Applicable

FSA Client Classification:       Large Risk

---



Policy Number: QK1102774



### AFB MEDIA TECH® FOR CONVERGYS CORPORATION (2011)

**PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, COMPUTER NETWORK SECURITY, PRIVACY LIABILITY AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY**

NOTICE: This Coverage is provided on a Claims Made and Reported Basis. Subject to the terms of this Policy, this coverage applies only to **Claims** first made against the **Insured** and reported to the Underwriters during the **Policy Period** or **Optional Extension Period**, if applicable, provided such **Claim** is reported in writing to the Underwriters as soon as practicable in accordance with the notice provision herein. Amounts incurred as **Claims Expenses** under this Policy shall reduce and may exhaust the Limit of Liability and are subject to the **Deductibles**. Please review the coverage afforded under this Insurance Policy carefully and discuss the coverage hereunder with your insurance agent or broker.

The Underwriters agree with the Named Insured, set forth in the schedule made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the **Application** which is made a part of and attached to this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") and subject to the Limit of Liability, deductible, exclusions, conditions and other terms of this Insurance:

I.      **INSURING CLAUSES**

      A.      **Professional and Technology Based Services Coverage**

            To pay on behalf of any **Insured**:

            **Damages** and **Claims Expenses**, in excess of the Each **Claim** Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** and reported in writing to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable) arising out of:

                1.      any negligent act, error or omission, or any unintentional breach of contract; or

                2.      any violation of the Fair Debt Collection Practices Act, Fair Credit Reporting Act or any regulation promulgated thereunder or any similar federal law or legislation, or law or legislation of any state, province or other jurisdiction similar to the foregoing, whether such law is statutory, regulatory or common law

            in rendering or failure to render **Professional Services** or **Technology Based Services** on or after the Retroactive Date set forth in the schedule and before the end of the **Policy Period** by the **Insured** or by any person, including an independent contractor, for whose negligent act, error or omission or unintentional breach of contract the **Insured Organization** is legally responsible.

      B.      **Technology Products Coverage**

            To pay on behalf of any **Insured**:

            **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** and reported to the Underwriters pursuant to the terms of this Policy arising out of:

Policy Number: QK1102774



1.  any negligent act, error or omission, or any unintentional breach of contract, by the **Insured** on or after the Retroactive Date set forth in the schedule and before the end of the **Policy Period** that results in the failure of **Technology Products** to perform the function or serve the purpose intended; or

2.  infringement of copyright committed by the **Insured** on or after the Retroactive Date set forth in the schedule and before the end of the **Policy Period** with respect to software **Technology Products**.

C.  **Computer Network Security and Privacy Coverage**

1.  **Computer Network Security Coverage**

    To pay on behalf of the **Insured**:

    **Damages** and **Claims Expenses**, in excess of the Each **Claim** Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** and reported to the Underwriters pursuant to the terms of the Policy arising out of any act, error or omission on or after the Retroactive Date set forth in the schedule and before the end of the **Policy Period** in the course of providing or managing **Computer Systems** security by the **Insured** or by any person, including an independent contractor, for whose act, error or omission the **Insured Organization** is legally responsible that results in:

    (a)  the inability of a third party, who is authorized to do so, to gain access to **Computer Systems** or your **Technology Based Services**;

    (b)  the failure to prevent **Unauthorized Access** to **Computer Systems** that results in:

        (i)  the destruction, deletion or corruption of electronic data on **Computer Systems**;

        (ii)  **Theft of Data** from **Computer Systems**; or

        (iii)  denial of service attacks against Internet sites or computers; or

    (c)  the failure to prevent transmission of **Malicious Code** from **Computer Systems** to third party computers and systems.

2.  **Privacy Liability**

    To pay on behalf of the **Insured**:

    **Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim**, including a **Claim** for violation of a privacy law, first made against any **Insured** and reported to the Underwriters pursuant to the terms of the Policy for:

    (a)  theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** that is in the care,

Policy Number: QK1102774



custody or control of the **Insured Organization** or an **Information Holder**, and/or theft, loss or **Unauthorized Disclosure** of Third Party Corporate Information that is in the care, custody or control of the **Insured Organization** or an **Information Holder**, provided such theft, loss or **Unauthorized Disclosure** first takes place on or after the Retroactive Date set forth in in the schedule and before the end of the **Policy Period**;

(b) the **Insured Organization's** failure to timely disclose a **Security Breach** in violation of any **Breach Notice Law**; provided such **Security Breach** must take place on or after the Retroactive Date set forth in in the schedule and before the end of the **Policy Period**;

(c) failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

(i) prevents or prohibits improper or intrusive collection of **Personally Identifiable Non-Public Information** from a person;

(ii) requires notice to a person of the **Insured Organization's** collection or use of, or the nature of the collection or use of his or her **Personally Identifiable Non-Public Information**;

(iii) provides a person with the ability to assent to or withhold assent for (e.g. opt-in or opt-out) the **Insured Organization's** collection or use his or her **Personally Identifiable Non-Public Information**;

(iv) prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of a person's **Personally Identifiable Non-Public Information**;

(v) requires the **Insured Organization** to provide access to **Personally Identifiable Non-Public Information** or to correct incomplete or inaccurate **Personally Identifiable Non-Public Information** after a request is made by a person; or

(vi) mandates procedures and requirements to prevent the loss of **Personally Identifiable Non-Public Information**;

provided the acts, errors or omissions that constitute such failure to comply with a **Privacy Policy** must take place on or after the Retroactive Date set forth in the schedule and before then end of the **Policy Period**, and the **Insured Organization** must, at the time of such acts, errors or omissions have in force a **Privacy Policy** that addresses those subsections above that are relevant to such **Claim**.

3.   **Privacy Notification Costs**

To indemnify the Named Insured for:

**Privacy Notification Costs**, in excess of the Deductible and incurred by the **Insured Organization** with the Underwriters' prior written

Policy Number: QK1102774



consent, resulting from the **Insured Organization's** legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Clause I.C.1.(b)(ii) or I.C.2.(a) that first takes place on or after the Retroactive Date set forth in the schedule and before the end of the **Policy Period**; provided such incident or suspected incident must be reported to the Underwriters pursuant to the terms of this Policy;

**Privacy Notification Costs** means reasonable and necessary:

(a)     costs to hire a computer security expert to determine the existence of and cause of any theft or unauthorized disclosure of information;

(b)     costs to provide notification in compliance with a **Breach Notice Law**;

(c)     fees charged by an attorney to determine the applicability of and actions necessary to comply with **Breach Notice Laws**; and

(d)     costs of a credit file monitoring and public relations program, to be approved by the Underwriters, consisting of:

(i)     the offering of one (1) year of credit monitoring services to those individuals whose **Personally Identifiable Non Public Information** was compromised or reasonably believed to be compromised as a result of the theft or unauthorized disclosure of information giving rise to the notification requirement;

(ii)    mailing and other reasonable third party administrative costs associated with such program; and

(iii)   costs of a public relations consultancy, not to exceed USD $100,000;

provided all such costs under subsection (d) above must be incurred within one (1) year of discovery of such theft or unauthorized disclosure of information, be for the purpose of mitigating potential **Damages** resulting from such theft, loss or **Unauthorized Disclosure** of information, and are subject to twenty percent (20%) coinsurance.

**Privacy Notification Costs** shall not include any internal salary or overhead expenses of the **Insured Organization**.

4.      **Regulatory Defense and Penalties**

To pay on behalf of the **Insured**:

**Claims Expenses and Penalties** in excess of the Deductible, which the **Insured Organization** shall become legally obligated to pay because of any **Claim** in the form of a **Regulatory Proceeding** first made against any **Insured** and reported to the Underwriters during



the **Policy Period** or **Optional Extension Period** (if applicable) resulting from a violation of a **Privacy Law** and caused by an incident described in Insuring Clause I.C.2. (a) or (b) that takes place on or after the Retroactive Date set forth in the schedule and before the end of the **Policy Period.**

D. **Multimedia and Advertising Coverage**

To pay on behalf of any **Insured**:

**Damages** and **Claims Expenses**, in excess of the Each **Claim** Deductible, which the **Insured** shall become legally obligated to pay because of liability imposed by law or **Assumed Under Contract** resulting from any **Claim** first made against any **Insured** and reported to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable) arising out of one or more of the following acts committed on or after the Retroactive Date set forth in the schedule and before the end of the **Policy Period** in the course of the **Insured Organization's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**:

1.  defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.  invasion of or interference with the right to privacy or of publicity;

3.  misappropriation of any name or likeness for commercial advantage;

4.  false arrest, detention or imprisonment;

5.  invasion of or interference with any right to private occupancy, including trespass, wrongful entry or wrongful eviction;

6.  plagiarism, piracy or misappropriation of ideas under implied contract;

7.  infringement of copyright;

8.  infringement of trade dress, domain name, title or slogan, or the dilution or infringement of trademark or service mark;

9.  negligence regarding the content of any **Media Communication**, including harm caused through any reliance or failure to rely upon such content;

10. misappropriation of trade secret; or

11. solely with respect to **Media Activities**, unfair competition, but only if alleged in conjunction with any of the acts listed in paragraphs 7. or 8. above;

provided, Insuring Clauses I.A., I.B., I.C. and I.D. of this Insurance shall not apply to any **Claim** for or arising out of the disclosure, misuse or misappropriation of any ideas, trade secrets or confidential information that came into the possession of any person prior to the date he or she became



Policy Number: QK1102774 

an employee, officer, director, principal or partner of the **Insured Organization**.

II.   **DEFENSE, SETTLEMENT, AND INVESTIGATION OF CLAIMS**

A.   It shall be the duty of the **Insured** and not the duty of Underwriters to defend **Claims**. Underwriters shall have the right and shall be given the opportunity to effectively associate with the **Insured** in the investigation, defense and settlement of any **Claim** that appears reasonably likely to be covered in whole or in part hereunder.

Subject to the payment of the Deductible as provided in section VIII, and allocation pursuant to section II.B, Underwriters shall advance on behalf of the **Insureds Claims Expenses** which the **Insureds** have incurred in connection with a **Claim** made against them, prior to the final disposition of such **Claim**, provided that to the extent it is finally established that any such **Claims Expenses** are not covered under this Policy, the Named Insured shall repay such **Claims Expenses** to Underwriters. Underwriters shall pay **Claims Expenses** no more than once every 90 days.

B.   If both **Damages** and **Claims Expenses** covered by this Policy and **Damages** and **Claims Expenses** uncovered by this Policy are incurred, either because the **Claim** includes both covered and uncovered claims or because it includes both insured and uninsured parties, then the **Insured** and Underwriters agree to fairly and reasonably allocate such amount between covered **Damages** and **Claims Expenses** and uncovered **Damages** and **Claims Expenses**.

In the event that a method of allocation cannot be agreed upon by Underwriters and the **Insured**, then:

1.   in any arbitration, suit or other proceeding, no presumption shall exist concerning what is a fair and reasonable allocation;

2.   Underwriters shall advance the amount of **Claims Expenses** which they deem fair and proper until a different amount is negotiated by the parties, determined pursuant to the arbitration process set forth in subparagraph 3. below, or determined judicially;

3.   Underwriters, solely if requested by the **Insured**, shall submit the dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the **Insured**, one arbitrator selected by Underwriters, and a third independent arbitrator selected by the first two arbitrators.

Any negotiated, arbitrated or judicially determined allocation of **Claims Expenses** on account of a **Claim** shall be applied retroactively to all **Claims Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Claims Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

C.   The Named Insured shall have the right to select defense counsel. For any particular **Claim**, if the Named Insured obtains Underwriters' consent to defense counsel chosen for such **Claim**, the hourly rates actually charged by such defense counsel shall be used to determine **Claims Expenses** for such

Policy Number: QK1102774



Claim.  If, however, the Named Insured does not obtain Underwriters' consent to defense counsel chosen for a particular **Claim**, then the hourly rates for attorneys used to determine **Claims Expenses** for such **Claim** shall be a maximum of USD 500 per hour for partners, USD 350 per hour for associates and USD 175 per hour for paralegals.

D.   Underwriters agree that the **Insured** may settle any **Claim** where the **Damages** and **Claims Expenses** do not exceed the applicable Deductible, provided the entire **Claim** is resolved and the **Insured** obtains a full release from all claimants.  The Limit of Liability available to pay **Damages, Penalties** or **Privacy Notification Costs** shall be reduced and may be completely exhausted by payment of **Claims Expenses.  Damages, Penalties, Privacy Notification Costs** and **Claims Expenses** shall be applied against the Each **Claim** Deductible.

E.   If the **Insured** shall refuse to consent to any settlement or compromise recommended by the Underwriters and acceptable to the Claimant and elects to contest the **Claim**, the Underwriters' liability for any **Damages, Penalties** and **Claims Expenses** shall not exceed:

1.   the amount for which the **Claim** could have been settled, less the remaining Deductible, plus the **Claims Expenses** incurred up to the time of such refusal, and

2.   fifty percent (50%) of any **Damages** and **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** with the remaining fifty percent (50%) of such **Damages** and **Claims Expenses** to be borne by the **Insured** at their own risk and uninsured

or the applicable Limit of Liability, whichever is less.  The portion of any proposed settlement or compromise that requires the **Insured** to cease, limit or refrain from actual or alleged infringing or otherwise injurious activity or is attributable to future royalties or other amounts that are not **Damages** (or **Penalties** for **Claims** covered under Insuring Clause C.4.} shall not be considered in determining the amount for which a **Claim** could have been settled.

III.   **THE INSURED AND THE INSURED ORGANIZATION**

As used throughout this Policy, whether expressed in singular or plural, "**Insured**" shall mean:

A.   The Named Insured and any **Subsidiaries** of the Named Insured (together the "**Insured Organization**");

B.   A director or officer of a corporation, member of the board of managers of a limited liability company or management committee member of a joint venture or partnership of the **Insured Organization,** and any person serving in a functionally equivalent role for any **Subsidiary** operating or organized outside the United States, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization;**

C.   An employee, leased employee, part time or seasonal employee of the **Insured Organization,** but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

AFB
2623
623

Policy Number: QK1102774 

D.  A principal if the Named Insured is a sole proprietorship, or a partner if the Named Insured is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

E.  Any person who previously qualified as an **Insured** under B, C or D above prior to the termination of the required relationship with the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

F.  The estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Insurance;

G.  the lawful spouse or domestic partner of any of the persons set forth in B, C, D or E above, but only to the extent the spouse or domestic partner is a party to any **Claim** solely in the capacity as spouse or domestic partner of any such persons and only for the purposes of any **Claim** seeking **Damages** recoverable from marital community property, property jointly held by any such person and the spouse, or property transferred from any such person to the spouse or domestic partner;

H.  Any **Independent Contractor** of the **Insured Organization**;

"**Independent Contractor**" means any natural person independent contractor who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Insured Organization**. The status of an individual as an **Independent Contractor** shall be determined as of the date of an alleged act, error or omission by any such **Independent Contractor**; and

I.  An **Additional Insured**, but only as respects the vicarious liability of such person or entity for negligent acts, errors or omissions of the **Insured Organization** otherwise covered by this Insurance.

**Additional Insured** means:

1.  any natural person or entity that the **Insured Organization** has expressly agreed in writing to add as an **Additional Insured** under this policy prior to the commission of any act for which such person or entity would be provided coverage for under this Policy, but only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Policy had such **Claim** been made against the **Insured Organization**; and

2.  any other person or entity added an **Additional Insured** by endorsement to this Policy.

## IV.  TERRITORY

This Insurance applies to **Claims** made and acts, errors or omissions committed anywhere in the world.

Policy Number: QK1102774



### V.   EXCLUSIONS

The coverage under this Insurance does not apply to **Damages, Penalties** or **Claims Expenses** in connection with or resulting from any **Claim**, or to any **Privacy Notification Costs**:

A.   With respect to Insuring Clause I.A., I.B. and I.D., for, arising out of or resulting from any criminal (except where such criminal act is based on unintentional conduct) dishonest, fraudulent or malicious act, error or omission committed by any **Insured**; however, this Policy shall apply to **Claims Expenses** incurred in defending any such **Claim** alleging the foregoing until such time as there is a final adjudication, judgment, binding arbitration decision or conviction against the **Insured**, or written admission by the **Insured**, establishing such conduct, at which time the Named Insured shall reimburse the Underwriters for all **Claims Expenses** incurred defending the **Claim** and the Underwriters shall have no further liability for **Claims Expenses**;

With respect to Insuring Clause I.C.:

1.   against any individual **Insured** if the **Claim** arises out of or relates to any criminal (except where such criminal act is based on unintentional conduct), dishonest, fraudulent or malicious act, error or omission, any **Security Breach**, intentional violation of a **Privacy Policy**, or intentional or knowing violation of the law, if committed by such **Insured** or by others if the **Insured** colluded or participated in any such conduct or activity; or

2.   against the **Insured Organization** if the **Claim** (or obligation to incur **Privacy Notification Costs**) arises out of or results from any criminal (except where such criminal act is based on unintentional conduct), dishonest, fraudulent or malicious act, error or omission, any **Security Breach**, intentional violation of a **Privacy Policy**, or intentional or knowing violation of the law, if committed by any of the **Insured Organization's** principals, directors, officers, members of the board of managers or management committee members, or any person in participation or collusion with any of the **Insured Organization's** principals, directors, officers, members of the board of managers or management committee members;

B.   For, arising out of or resulting from any act, error or omission committed prior to the inception date of this Insurance:

1.   if any of the **Control Group** on or before 1 August 2010 knew or could have reasonably foreseen that such act, error or omission might be expected to be the basis of a **Claim**; or

2.   in respect of which any **Insured** has given notice of a circumstance which might lead to a **Claim** to the insurer of any other policy in force prior to the inception date of this Policy;

C.   For, arising out of or resulting from any related or continuing acts, errors or omissions where the first such act, error or omission was committed prior to the Retroactive Date set forth in the schedule;

AFB
2623
623

Policy Number: QK1102774 

D.    For, arising out of or resulting from **Bodily Injury** or **Property Damage**; provided, this Exclusion D. shall not apply to any **Claim for Contingent Bodily Injury and/or Property Damage.**

For the purpose of this exclusion, the term **"Contingent Bodily Injury and/or Property Damage"** means those **Claims** wherein the **Damages** sought by the claimant are for **Bodily Injury** and/or **Property Damage** which arise solely out of:

1.    any negligent act, error or omission in rendering or failure to render **Professional Services** or **Technology Based Services;**

2.    any one or more of the acts listed in Insuring Clause I.C. in the course of managing **Computer Systems** security or from the loss or theft of **Personally Identifiable Non-Public Information; or**

3.    any one or more of the acts listed in Insuring Clause I.D. in the course of the **Insured Organization's** performance of **Professional Services, Media Activities** or **Technology Based Services,**

which is otherwise covered under the terms and conditions of this Policy; but not if the **Insured's** own act, error or omission is the direct immediate cause of such **Claim** for **Bodily Injury** and/or **Property Damage.** Furthermore, this extension of coverage applies only if such **Claim for Bodily Injury** and/or **Property Damage** is not covered under any other policy of insurance of the **Insured Organization.**

As a condition of the application of this exception to Exclusion D., the Named Insured shall maintain during the term of this Policy a Commercial General Liability policy including Products and Completed Operations, and any coverage under this Policy is excess to the coverage provided or which should have been provided by such Commercial General Liability policy.

E.    For, arising out of or resulting from any contractual liability or obligation, or arising out of or resulting from breach of contract or agreement either oral or written, except:

1.    with respect to Insuring Clause I.A. for breach of an agreement by the **Insured Organization** to perform **Professional Services** or **Technology Based Services;** or Insuring Clause I.B. for breach of an agreement by the **Insured Organization** to manufacture, develop, create, distribute, license, lease or sell **Technology Products;** provided, this Exclusion E.1. shall not apply to liability assumed in any hold harmless or indemnity agreement other than liability assumed in any hold harmless or indemnity agreement with respect to intellectual property rights or the protection of the confidentiality of third party information;

2.    with respect to Insuring Clause I.D. for liability:

(a)    **Assumed under Contract; or**

(b)    misappropriation of ideas under an implied contract; or

3.    to the extent the **Insured** would have been liable in the absence of such contract or agreement;

F.    For, arising out of or resulting from:

Policy Number: QK1102774 

1.  breach of any express warranty or representation except for an agreement to perform within a reasonable standard of care or skill consistent with applicable industry standards or for breach of any implied statutory term concerning necessary quality, safety or fitness, or breach of any other contractual obligation which goes beyond an express or implied duty to exercise a degree of care or skill as is consistent with applicable industry standards;

2.  breach of guarantee or any promises of cost savings, profits, or return on investment; or

3.  delay in delivery or performance, or failure to deliver or perform at or within an agreed upon period of time, but this Exclusion F.3. shall not preclude coverage if such delay or failure to deliver or perform is a consequence of an act error or omission committed during the course of providing **Professional Services** or **Technology Based Services** if the **Insured** has made diligent efforts to deliver or perform such **Professional Services** or **Technology Based Services;**

G.  For, arising out of or resulting from:

1.  inaccurate, inadequate, or incomplete description of the price of goods, products or services;

2.  cost guarantees, cost representations, or contract price estimates of probable costs or cost estimates actually or allegedly being exceeded;

3.  the failure of goods, products, or services to conform with any represented quality or performance contained in **Advertising**; or

4.  any actual or alleged gambling, contest, lottery, promotional game or other game of chance;

H.  For, arising out of or resulting from any actual or alleged obligation to make licensing fee or royalty payments, including but not limited to the amount or timeliness of such payments;

I.  For, arising out of or resulting from any costs or expenses incurred or to be incurred by the **Insured** or others for:

1.  the reprinting, recall, removal or disposal of any **Media Material**, including any media or products containing such **Media Material**; or

2.  the withdrawal, recall, inspection, repair, replacement, reproduction, removal or disposal of:

(a)  **Technology Products**, including any products or other property of others that incorporate **Technology Products;**
(b)  work product resulting from or incorporating the results of **Professional Services** or **Technology Based Services;** or
(c)  any products or other property on which **Professional Services** or **Technology Based Services** are performed;

however, this Exclusion I. shall not apply to third party **Claims** for the resulting loss of use of such **Media Material** or **Technology Products**, or loss of use of the work product resulting from such **Professional Services** or **Technology Based Services;**

Policy Number: QK1102774 

J. Arising out of, resulting from or alleging:

    1. any failure or malfunction of electrical or telecommunications infrastructure or services, unless under the **Insured Organization's** operational control; or

    2. fire, flood, earthquake, volcanic eruption, explosion, lighting, wind, hail, tidal wave, landslide, act of God or other physical event;

K. For, arising out of or resulting from any actual or alleged antitrust violation, restraint of trade, unfair competition (except as provided in Insuring Clause I.D.11.), violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, as amended, false, deceptive or unfair trade practices, violation of consumer protection laws (except for consumer privacy protection laws under Insuring Clause I.C.) or false or deceptive or misleading advertising;

L. For, in connection with or resulting from a **Claim** brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; provided this Exclusion L. shall not apply to:

    1. coverage provided under Insuring Clause I.C.4.; or

    2. a **Claim** by a government entity brought in its capacity as a customer of the **Insured Organization** arising in the course of the **Insured Organization's** provision of **Professional Services, Technology Based Services, Media Activities** or **Technology Products** to such government entity pursuant to a written agreement between such government entity and the **Insured Organization;**

M. For, arising out of or resulting from any actual or alleged:

    1. infringement of patent or patent rights or misuse of patent;

    2. misappropriation of trade secret arising out of or related to software or **Technology Products;**

N. For, arising out of or resulting from the actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act or RICO), as amended, or any regulation promulgated thereunder or any similar federal law or legislation, or law or legislation of any state, province or other jurisdiction similar to the foregoing, whether such law is statutory, regulatory or common law;

O. For, arising out of or resulting from the actual or alleged violation of any securities law, regulation or legislation, including but not limited to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Act of 1940, the Sarbanes-Oxley Act of 2002, any state or provincial blue sky or securities law, any other federal securities law or legislation, or any or similar law or legislation of any state, province or other jurisdiction, or any amendment to the above laws, or any violation of any order, ruling or regulation issued pursuant to the above laws;

P. By or on behalf of one or more **Insureds** under this Insurance against any other **Insured** or **Insureds** under this Insurance; provided this Exclusion P. shall not apply to:



Policy Number: QK1102774 

1.   an otherwise covered claim under Insuring Clause I.C.1 (b)(ii) or I.C.2.(a) made by an employee of the **Insured Organization**; or

2.   any **Claim** by or on behalf of an **Additional Insured**;

Q.   Made by any business enterprise in which any **Insured** has greater than a fifteen percent (15%) ownership interest or made by any parent company or other entity which owns more than fifteen percent (15%) of the Named Insured, or arising out of or resulting from any **Insured's** activities as a trustee, partner, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the **Insured Organization**;

R.   Arising out of **Professional Services, Media Activities** or **Technology Based Services**, performed for any entity, or **Technology Products** provided to any entity which:

1.   is operated, managed or controlled by an **Insured** or in which any **Insured** has an ownership interest in excess of fifteen percent (15%); or in which any **Insured** is an officer or director; or

2.   operates, controls or manages the Named Insured, or has an ownership interest of more than fifteen percent (15%) in the Named Insured;

S.   Arising out of or resulting from the insolvency or bankruptcy of any **Insured**;

T.   For, arising out of or resulting from:

1.   any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees, whether such **Claim** is brought by an employee, former employee, applicant for employment, or relative of such person;

2.   actual or alleged violation of the Fair Labor Standards Act of 1938, the National Labor Relations Act, the Worker Adjustment and Retraining Act of 1988, the Certified Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act of 1970, any similar law or legislation of any state, province or other jurisdiction, or any amendment to the above law or legislation, or any violation of any order, ruling or regulation issued pursuant to the above laws or legislation;

3.   any actual or alleged discrimination of any kind including but not limited to age, color, race, sex, creed, national origin, marital status, sexual preference, disability or pregnancy; provided this exclusion shall not apply to a **Claim** arising out of or resulting from the **Insured Organization's** provision of **Professional Services** or **Technology Based Services**;

4.   any actual or alleged acts, errors or omissions related to any pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts of the **Insured Organization**; or any violation of any provision of the Employee Retirement Income Security Act of 1974 or any similar federal law or legislation, or similar law or legislation of any state, province or other jurisdiction, or any



amendment to the Act or any violation of any regulation, ruling or order issued pursuant to the Act or such similar laws or legislation; or

5.    any actual or alleged act, error or omission or breach of duty by any director or officer in the discharge of their duty if the **Claim** is brought by the Named Insured, a **Subsidiary**, or any directors, officers, stockholders, or employees of the Named Insured or a **Subsidiary** in his or her capacity as such;

U.    For, arising out of or resulting from any actual or alleged eavesdropping, wiretapping, bugging or unlawful audio or video recording done by or on behalf of the **Insured Organization**;

V.    With respect to coverage provided under Insuring Clause I.C.2., I.C.3. and I.C.4., for, arising out of or resulting from:

1.    the unlawful distribution of unsolicited email, direct mail, or facsimiles; or

2.    telemarketing;

by or on behalf of the **Insured Organization**, and provided that this Exclusion V. shall not apply to any **Claim** arising out of acts, errors or omissions in the maintenance or updating of "opt-in" or "opt-out" databases;

W.    Either in whole or in part, directly or indirectly, arising out of or resulting from or in consequence of, or in any way involving:

1.    asbestos, or any materials containing asbestos in whatever form or quantity;

2.    the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

The Underwriters will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3.    the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

Policy Number: QK1102774 

4.  the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed;

**VI.   DEFINITIONS**

Wherever used in this Policy in bold face type, the following definitions shall apply.

A.  "**Advertising**" means material which promotes the product, service or business of the **Insured Organization** or others.

B.  "**Application**" means all signed applications, including all attachments and other materials submitted therewith or incorporated therein, and any other such documents submitted in connection with the underwriting of this Policy including any endorsement or other part thereof or any other professional liability policy issued by the Underwriters, of which this Policy is a renewal or, replacement or which succeeded it in time.

C.  "**Assumed Under Contract**" means liability assumed by the **Insured Organization** under a written hold harmless or indemnity agreement regarding the content of **Media Material** used in a **Media Communication**, but only as respects acts for which insurance is afforded under Insuring Clause I.D.

D.  "**Bodily Injury**" means physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting therefrom.

E.  "**Breach Notice Law**" means any state, federal or foreign statute or regulation that requires notice to persons whose **Personally Identifiable Non-Public Information** was accessed or may reasonably have been accessed by an unauthorized person.

F.  "**Claim**" means;

1.  a written demand received by any **Insured** for money or services, including the service of suit or institution of arbitration proceedings;

2.  a threat or initiation of a suit against any **Insured** seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction); and

3.  with respect to coverage provided under Insuring Clause I.C.4. only, institution of a **Regulatory Proceeding** against the **Insured Organization**;

Multiple **Claims** arising from the same or a series of related or repeated acts, errors or omissions or from any continuing acts, errors or omissions shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of Claimants or **Insureds** involved in the **Claim**. All such **Claims** shall be deemed to have been made at the time of the first such **Claim**.

Policy Number: QK1102774



G.     "Claims Expenses" means:

    1.    reasonable and necessary fees charged by an attorney designated in accordance with Clause II., Defense, Settlement and Investigation of Claims, paragraph A.; and

    2.    all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, or circumstance which might lead to a **Claim**, if incurred by the Underwriters or by the **Insured** with the prior written consent of the Underwriters;

    3.    premiums for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required for any **Claim** against an **Insured** for a covered act, error or omission, provided however that Underwriters shall have no obligation to appeal or to obtain bonds;

**Claims Expenses** shall not include any salary, overhead or other charges of or by an **Insured** for any time spent in cooperating in the defense and investigation of any **Claim** or circumstance that might lead to a **Claim** notified under this Policy.

H.     **"Control Group"** means the individuals holding the following positions in the **Insured Organization**: President; members of the Board of Directors; executive officers, including the Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer; General Counsel; staff attorneys employed by the **Insured Organization**; Chief Information Officer; Chief Security Officer; Chief Privacy Officer; and any individual in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual, and any individual who previously held any of the above referenced positions.

I.     "Computer Systems" means computers and associated input and output devices, data storage devices, networking equipment, and back up facilities:

    1.    operated by and either owned by or leased to the **Insured Organization**; or

    2.    operated by a third party service provider and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data, pursuant to written contract with the **Insured Organization** for such services.

J.     "Damages" means a monetary judgment, award or settlement.

The term **Damages** shall not include or mean:

    1.    future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or non-monetary equitable relief;

    2.    return or offset of fees, charges, or commissions for goods or services already provided or contracted to be provided; but this limitation shall not apply for an offset of fees, charges, or commissions that is being used as a contractual measure, cap or

AFB
2623
623

Policy Number: QK1102774 

limitation of the Insured's liability if such amounts are otherwise covered **Damages** caused by a negligent act, error or omission in the course of providing **Professional Services** or **Technology Based Services** or that results in a failure of **Technology Products** to perform the function or serve the purpose intended.

3.    costs incurred by the **Insured** to correct, re-perform or complete any **Professional Services, Media Activities** or **Technology Based Services;**

4.    taxes or loss of tax benefits, or fines, sanctions or penalties assessed against the **Insured;**

5.    punitive or exemplary damages, or any damages which are a multiple of compensatory damages, unless insurable by law; provided that for purposes of this provision, the law most favorable to insurability of such damages shall be applied;

6.    discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7.    liquidated damages pursuant to a liquidated damages clause in a contract or agreement to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such contract or agreement;

8.    any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured;**

9.    matters deemed uninsurable under the law pursuant to which this Policy shall be construed; provided that for purposes of this provision, the law most favorable to insurability shall be applied; and

For purposes of applying exception 5. and 9. above, the most favorable law of the following applicable jurisdictions shall be applied: (a) where the **Claim** is made or brought; (b) where the **Insured Organization** is incorporated or has its principal place of business; (c) where the natural person **Insured** liable for such damages resides (if applicable); and (d) where the Underwriters are incorporated or have their principal place of business.

K.    **"Information Holder"** means a third party outsourced transaction, business process, web hosting, collocation, or data warehousing service provider providing such services to the **Insured Organization** and to which the **Insured Organization** has provided **Personally Identifiable Non- Public Information** or **Third Party Corporate Information** pursuant to a written contract requiring such service provider to protect the confidentiality of such information; but only for a **Claim** arising out of the failure of the **Information Holder** to protect **Personally Identifiable Non-Public Information** or **Third Party Corporate Information** provided to it by the **Insured Organization** from theft.

L.    **"Malicious Code"** means any virus, Trojan Horse, worm or other similar software program, code or script intentionally designed to insert itself into computer memory or onto a computer disk and spread itself from one computer to another.

M.    **"Media Activities"** means **Media Communications** and/or the gathering, collection or recording of **Media Material** for inclusion in any **Media**

AFB
2523
623



Communication in the ordinary course of the **Insured Organization's** business.

N.   "**Media Communication**" means the display, broadcast, dissemination, distribution or release of **Media Material** to the public by the **Insured Organization**.

O.   "**Media Material**" means information in the form of words, sounds, numbers, images, or graphics in electronic, print or broadcast form, including **Advertising**, but does not mean computer software.

P.   "**Optional Extension Period**" means the period of time after the end of the **Policy Period** for reporting **Claims** as provided in Clause X., Notice of Claim, or Circumstance That Might Lead to a Claim, of this Policy.

Q.   "**Penalties**" means:

1.   any civil fine or money penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding** by the Federal Trade Commission, Federal Communications Commission, or any other federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; the insurability of **Penalties** shall be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**; and

2.   amounts which the **Insured** is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund"); but and shall not include payments to charitable organizations or disposition of such funds other than for payment of consumer claims for losses caused by an event covered by Insuring Clauses I.C.1.(b)(ii), I.C.2.(a) or I.C.2.(b);

but shall not mean costs to remediate or improve **Computer Systems**, security or privacy practices,  procedures or policies, audit, compliance or reporting costs, or costs to protect the confidentiality and/or security of **Personally Identifiable Non-Public Information** from theft, loss or disclosure.

R.   "**Personally Identifiable Non-Public Information**" means:

1.   information concerning an individual that constitutes "non-public personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to the Act;

2.   medical or heath care information concerning an individual, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to the Act; or

3.   information concerning the individual that is defined as private personal information under statutes enacted to protect such information in foreign countries, for Claims subject to the law of such jurisdiction;

4.   information concerning the individual that is defined as private personal information under a Breach Notice Law; or



Policy Number: QK1102774 

5.     an individual's drivers license or state identification number; social security number; unpublished telephone number; and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or pins;

if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information but does not include publicly available information that is lawfully made available to the general public from government records.

S.     "**Policy Period**" means the period of time between the inception date shown in the schedule and the effective date of termination, expiration or cancellation of this Insurance and specifically excludes any **Optional Extension Period** or any prior policy period or renewal period.

T.     "**Privacy Law**" means a federal, state or foreign statute or regulation requiring the **Insured Organization** to protect the confidentiality and/or security or **Personally Identifiable Non-Public Information**.

U.     "**Privacy Policy**" means the internal or publicly accessible written documents that set forth the **Insured Organization's** policies, standards and procedures for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to, **Personally Identifiable Non-Public Information**

V.     "**Professional Services**" means the following services performed for others by or on behalf of the **Insured Organization**:

Customer management, which provides agent-assisted services, automated self-service and technology solutions; information management, which provides business support system and operational support system solutions; human resources management, which provides global human resource business process outsourcing solutions, debt collection services and all other related services, and transition services for NorthgateArinso under the written sales agreement, for a fee but does not include **Technology Based Services, Media Activities**, any services involving the creation, development, sale, distribution, installation, licensing or manufacturing of **Technology Products**, or work or activities performed by or on behalf of the **Insured Organization** or for the **Insured Organization** as an accountant, architect, surveyor, health care provider, lawyer, real estate agent or broker, or civil or structural engineer.

W.    "**Property Damage**" means physical injury to or destruction of any tangible property, including any resulting loss of use thereof.  For the purposes of this definition, the term "tangible property" shall not include computer data, software and programs.

X.     "**Regulatory Proceeding**" means a request for information, civil investigative demand, or civil proceeding commenced by service of a complaint or similar proceeding brought by or on behalf of the Federal Trade Commission, Federal Communications Commission, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

Y.     "**Security Breach**" means **Unauthorized Access** of **Computer Systems**, infection of **Computer Systems** by **Malicious Code** or transmission of

Policy Number: QK1102774



Malicious Code from Computer Systems, whether any of the foregoing is specifically targeted attack or a generally distributed attack. A series of continuing Security Breaches or related or repeated Security Breaches shall be considered a single Security Breach and be deemed to have occurred at the time of the first such Security Breach.

Z.   "Subsidiary" means any corporate entity while more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the Named Insured directly or indirectly, if such entity was so owned on the inception date of this Policy; or:

1.   was so owned prior to the inception date of this Policy and was insured under a policy issued by the Underwriters of which this Policy is a renewal;

2.   becomes so owned after the inception date of this Policy, provided the revenues of the entity do not exceed ten percent (10%) of the Named Insured's annual revenues as set forth in its most recent Application; or

3.   becomes so owned after the inception date of this Policy provided that if the revenues of the entity exceed ten percent (10%) of the Named Insured's annual revenues as set forth in its most recent Application, the provisions of Clause XVI., Mergers and Acquisitions, must be fulfilled;

provided that this Policy only provides coverage for acts, errors or omissions taking place while the corporate entity is so owned by the Named Insured.

AA.   "Technology Based Services" means computer and electronic technology services, including data processing, Internet services, data and application hosting, computer systems analysis, technology consulting and training, custom software programming for a specific client of the Insured Organization, computer and software systems installation and integration, computer and software support, and network management services performed by the Insured, or by others acting under the Insured Organization's trade name, for others, but shall not mean Technology Products.

BB.   "Technology Products" means a computer or telecommunications hardware or software product, or related electronic product that is created, manufactured or developed by the Insured Organization for others, or distributed, licensed, leased or sold by the Insured Organization to others, including software updates, service packs and other maintenance releases provided for such products.

CC.   "Theft of Data" means the unauthorized taking, misuse or disclosure of information on Computer Systems, including but not limited to charge, debit, and credit card information, banking, financial, and investment services account information, proprietary information, and personal, private, and confidential information.

DD.   "Third Party Corporate Information" means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public.

---



Policy Number: QK1102774



EE.   **"Unauthorized Access"** means:

1.   the use of or access to **Computer Systems** by a person not authorized to do so by the **Insured Organization**; or

2.   the authorized use of or access to **Computer Systems** in a manner not authorized by the **Insured Organization.**

FF.   **"Unauthorized Disclosure"** means the disclosure of or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent, or acquiescence of any member of the Control Group.

**VII.    LIMIT OF LIABILITY**

The Limit of Liability (a) stated in the schedule for "Each **Claim**" is the limit of the Underwriters' liability for all **Damages** and **Claims Expenses** arising out of each **Claim**.

The "Aggregate for the Policy Period" stated in Limit of Liability (b) of the Schedule is the Underwriters' combined total Limit of Liability for all **Damages, Penalties, Privacy Notification Costs** and **Claims Expenses** arising out of all **Claims** or circumstances which might lead to a **Claim**, or incidents or requirements to comply with a **Breach Notice Law** which are covered under the terms and conditions of this Policy, and neither the inclusion of more than one **Insured** under this Policy, nor the making of **Claims** by more than one person or entity shall increase the Limit of Liability.

The sub-limit of liability (B) (1) stated in the schedule is the aggregate limit for the **Policy Period** for all **Privacy Notification Costs** covered under Insuring Clause I.C.3

The sub-limit of liability (B) (2) stated in the schedule is the aggregate limit for the **Policy Period**, for all **Claims Expenses** and **Penalties** covered under Insuring Clause I.C.4.

The Limit of Liability for the **Optional Extension Period** shall be part of and not in addition to the Limit of Liability of the Underwriters for the **Policy Period.**

**VIII.    DEDUCTIBLE**

The "Each **Claim** Deductible" stated in the schedule applies separately to each **Claim**.  The Each **Claim** Deductible shall be satisfied by monetary payments by the Named Insured of **Damages** and **Claims Expenses** resulting from **Claims** first made and reported to the Underwriters during the **Policy Period** and the **Optional Extension Period**.  Satisfaction of the Each **Claim** Deductible is a condition precedent to the payment by the Underwriters of any amounts hereunder, and the Underwriters shall be liable only for the amounts in excess of such Each **Claim** Deductible subject to the Underwriters' total liability not exceeding the Limits of Liability (A) and (B) stated in the schedule.  The Named Insured shall make direct payments within the Each **Claim** Deductible to appropriate other parties designated by the Underwriters.

The "Each Incident Deductible" stated in the schedule applies separately to each incident giving rise to an obligation to incur **Privacy Notification Costs**.  The Each Incident Deductible shall be satisfied by monetary payments by the Named Insured of **Privacy Notification Costs**.  Satisfaction of the Each Incident Deductible is a condition precedent to the payment by the Underwriters of any amounts hereunder, and the Underwriters shall be liable only for the amounts in excess of such Each

Policy Number: QK1102774                                    

Incident Deductible subject to the Underwriters' total liability not exceeding the Limits of Liability (A) and (B) in the schedule.

IX.    **INNOCENT INSURED**

A.    Whenever coverage under this Insurance would be excluded, suspended or lost because of Exclusion V.A relating to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Insured**, and with respect to which any other **Insured** did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge thereof, then the Underwriters agree that such insurance as would otherwise be afforded under this Policy shall cover and be paid with respect to those **Insureds** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more of the acts, errors or omissions described in Exclusion V.A.

This provision is inapplicable to any **Claim** or circumstance that could reasonably be the basis of a **Claim** against the **Insured Organization** arising from acts, errors or omissions known to any present or former principal, partner, director or officer of the **Insured Organization.**

B.    With respect to this provision, the Underwriters' obligation to pay in such event shall be in excess of the full extent of any recoverable assets of any **Insured** to whom Exclusion V.A. applies and shall be subject to the terms, conditions and limitations of this Policy.

X.    **NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM**

A.    If any **Claim** is made against the **Insured**, the **Insured**, upon knowledge of any member of the **Control Group**, shall forward as soon as practicable to Underwriters through persons named in the schedule written notice of such **Claim** in the form of a telecopy, or express or certified mail together with every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative.

B.    If during the **Policy Period** the **Insured** first becomes aware of any circumstance that could reasonably be the basis for a **Claim** and gives written notice to Underwriters in the form of a telecopy, or express or certified mail through persons named in the schedule as soon as practicable during the **Policy Period** of:

1.    the specific details of the act, error or omission in the provision of **Professional Services, Media Activities** or **Technology Based Services** or relating to **Technology Products** that could reasonably be the basis for a **Claim;**

2.    the injury or damage which may result or has resulted from the circumstance; and

3.    the facts by which the **Insured** first became aware of the act, error or omission

then any subsequent **Claim** made against the **Insured** arising out of such circumstance who is the subject of the written notice will be deemed to have been made at the time written notice complying with the above requirements was first given to Underwriters.



Policy Number: QK1102774



C.  With respect to any **Claims** first made against the **Insured** during the last sixty (60) days of the **Policy Period**, the **Insured** shall forward as soon as practicable to Underwriters through persons named in the schedule written notice of such **Claims** in the form of a telecopy, or express or certified mail, but in no event later than sixty (60) days after the end of the **Policy Period**.

D.  A **Claim** shall be considered to be reported to the Underwriters when written notice is first received by the Underwriters in the form of a telecopy, or express or certified mail through persons named in the schedule of the **Claim** or of an act, error, or omission, which could reasonably be expected to give rise to a **Claim** if provided in compliance with Section B above.

## XI.  OPTIONAL EXTENSION PERIOD

A.  In the event of cancellation or non-renewal of this Insurance by the Named Insured designated in the schedule or the Underwriters, the Named Insured shall have the right, upon payment of the Premium set forth below in full and not proportionately or otherwise in part, to have issued an endorsement providing the corresponding **Optional Extension Period** set forth below for **Claims** first made against any **Insured** and reported to the Underwriters during the **Optional Extension Period**, and arising out of any act, error or omission committed on or after the Retroactive Date and before the end of the **Policy Period**, subject to the conditions set forth in the definition of **Optional Extension Period** herein.

| Premium: Period: | Optional   Extension |
|---|---|
| 100% of the Premium set forth in the schedule | 12 months |
| 150% of the Premium set forth in the schedule | 24 months |
| Premium to be determined by the Underwriters at the time of such cancellation or non-renewal | 36 months |

In order for the Named Insured to invoke the **Optional Extension Period**, the payment of the additional premium for the **Optional Extension Period** must be paid to the Underwriters within thirty (30) days of the effective date of the non-renewal or cancellation.

B.  The Limit of Liability for the **Optional Extension Period** shall be part of, and not in addition to, the Limit of Liability of the Underwriters for the **Policy Period**.

C.  The quotation by the Underwriters of a different premium or Deductible or Limit of Liability or changes in policy language for the purpose of renewal shall not constitute a refusal to renew by the Underwriters.

D.  The right to the **Optional Extension Period** shall not be available to the Named Insured where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable Limit of Liability or within the amount of the applicable Deductible.

Policy Number: QK1102774 

E.   All notices and premium payments with respect to the **Optional Extension Period** shall be directed to the Underwriters through the entity named in the schedule.

F.   At the commencement of the **Optional Extension Period** the entire premium shall be deemed earned, and in the event the Named Insured terminates the **Optional Extension Period** for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the **Optional Extension Period**.

## XII.   REPRESENTATIONS

By acceptance of this Policy, all **Insureds** agree that the statements contained in the **Application** are their agreements and representations, that they shall be deemed material to the risk assumed by the Underwriters, and that this Policy is issued in reliance upon the truth thereof.

## XIII.   OTHER INSURANCE

This Insurance shall apply in excess of any other valid and collectible insurance available to any **Insured**, including any self insured retention or deductible portion thereof unless such other insurance is written only as specific excess insurance over the Limit of Liability of this Policy.

## XIV.   ASSIGNMENT

The interest hereunder of any **Insured** is not assignable.  If the **Insured** shall die or be adjudged incompetent, such insurance shall cover the **Insured's** legal representative as the **Insured** as would be permitted by this Policy.

## XV.   CANCELLATION/NONRENEWAL

A.   The Named Insured may cancel this Policy by surrender thereof to the Underwriters, or by mailing to the Underwriters written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**.  Delivery of such written notice shall be equivalent to mailing.

B.   The Underwriters may cancel this Policy by mailing or delivering to the Named Insured written notice stating when, not less than ninety (90) days thereafter, such cancellation shall be effective.  However, if the Underwriters cancel this Policy because the **Insured** has failed to pay a premium when due, this Policy may be cancelled by the Underwriters by mailing or delivering a written notice of cancellation to the Named Insured stating when not less than ten (10) days thereafter such cancellation shall be effective.  The notice of cancellation shall state the reason for cancellation.  The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**.  Delivery of such written notice by the Underwriters shall be equivalent to mailing.

## XVI.   MERGERS AND ACQUISITIONS

A.   During the **Policy Period**, if the Named Insured or any **Subsidiary** acquires another entity whose annual revenues are more than ten percent (10%) of the Named Insured's total annual revenues as set forth in the most recent **Application**; then the **Insured** shall have coverage under this Policy for any



**Claim** that arises out of any act, error or omission committed after such acquisition:

1.    by the acquired entity or any person employed by the acquired entity; or

2.    involving or relating to the assets, liabilities, or **Computer Systems** of the acquired entity;

for sixty (60) days after such acquisition; provided such coverage will terminate unless the Named Insured provides written notice to the Underwriters within sixty (60) days of the acquisition, obtains the written consent of the Underwriters to extend coverage to such additional entities, assets or exposures, and agrees to pay any additional premium required by the Underwriters.

Provided, if during the **Policy Period** the Named Insured or any **Subsidiary** acquires a privately held entity whose annual revenues are more than ten percent (10%) of the Named Insured's total annual revenues as set forth in the most recent Application for Insurance, then, subject to the **Policy Period** and all other terms and conditions of this Policy, coverage under this Policy shall be afforded for a period of sixty (60) days, but only for any **Claim** that arises out of any act, error or omission committed after the entity becomes so owned. Coverage beyond such sixty (60) day period shall only be available if the Named Insured gives the Underwriters written notice of the acquisition, obtains the written consent of Underwriters to extend coverage beyond such sixty (60) day period to the entity and agrees to pay any additional premium required by Underwriters.

B.    If during the **Policy Period** the Named Insured consolidates or merges with or is acquired by another entity, or sells substantially all of its assets to any other entity, then coverage under this Policy shall continue until termination of this Policy, but only with respect to any **Claim** that arises out of any act, error or omission committed, attempted, or allegedly committed by the **Insureds** prior to such merger or consolidation. The Named Insured shall provide written notice of such merger or consolidation to the Underwriters as soon as practicable, together with such information as the Underwriters may require.

## XVII.    ASSISTANCE AND COOPERATION OF THE INSURED

The **Insured** shall cooperate with the Underwriters in all investigations, including investigations regarding the **Application** for and coverage under this Policy. The **Insured** shall execute or cause to be executed all papers and render all assistance as is requested by the Underwriters. The **Insured** agrees not to take any action which in any way increases the Underwriters' exposure under this Policy.

Upon the Underwriters' request, the **Insured** shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of acts, errors or omissions with respect to which insurance is afforded under this Policy; and the **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

The **Insured** shall not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgement or award or dispose of any **Claim** without the written consent of the Underwriters, except as

Policy Number: QK1102774



specifically provided for in Clause II., Defense, Settlement, and Investigation of Claims, paragraph C.

Compliance with a **Breach Notice Law** will not be considered as an admission of liability.

Expenses incurred by the **Insured** in assisting and cooperating with the Underwriters, as described above, do not constitute **Claims Expenses** under the Policy.

### XVIII.   ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters unless, as a condition precedent thereto, the **Insured** shall have fully complied with all terms of this Policy nor until the amount of the **Insured's** obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and the Underwriters. Nothing contained herein shall give any person or organization any right to join the Underwriters as a party to any **Claim** against the **Insured** to determine their liability, nor shall the Underwriters be impleaded by the **Insureds** or their legal representatives in any **Claim**.

### XIX.   SUBROGATION

In the event of any payment under this Insurance, the Underwriters shall be subrogated to all the **Insureds'** rights of recovery therefore against any person or organization, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing to prejudice such rights. If the **Insured** has waived its right to subrogate against a third party through written agreement made before the **Claim** is made, then the Underwriters waive their rights to subrogation against such third party. Any recoveries shall be applied first to subrogation expenses, second to **Damages, Claims Expenses, Penalties** and **Privacy Notification Costs** paid by the Underwriters, and third to the Each **Claim** Deductible. Any additional amounts recovered shall be paid to the Named Insured.

### XX.   ENTIRE AGREEMENT

By acceptance of the Policy, all **Insureds** agree that this Policy embodies all agreements between them and the Underwriters relating to this Insurance. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Underwriters from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by written endorsement issued to form a part of this Policy, signed by the Underwriters.

### XXI.   VALUATION AND CURRENCY

All premiums, limits, deductibles, **Damages** and other amounts under this Policy are expressed and payable in the currency of the United States. If judgment is rendered, settlement is denominated or another element of **Damages** under this Policy is stated in a currency other than United States dollars or if **Claims Expenses** are paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Damages** is due or the date such **Claims Expenses** are paid.

---

AFB
2623
623

Policy Number: QK1102774



## XXII. BANKRUPTCY

Bankruptcy or insolvency of the Named Insured shall not relieve the Underwriters of their obligations nor deprive the Underwriters of their rights or defenses under this Policy.

## XXIII. AUTHORIZATION

By acceptance of this Policy, the **Insureds** agree that the Named Insured will act on their behalf with respect to the giving and receiving of any notice provided for in this Policy, the payment of premiums and the receipt of any return premiums that may become due under this Policy, and the agreement to and acceptance of endorsements.

## XXIV. HEADINGS

The descriptions in the headings and subheadings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

## XXV. SERVICE OF SUIT

It is agreed that in the event of the failure of the Underwriters to pay any amount claimed to be due hereunder, the Underwriters at the request of any person or entity insured hereunder will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction.  Nothing in this Clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon the firm shown in the schedule, and that in such suit instituted against any one of the Underwriters upon this Policy, the Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The firm shown in the schedule is authorized and directed to accept service of process on behalf of the Underwriters in any such suit and/or upon the request of any person or entity insured hereunder to give a written undertaking to such person or entity that it will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to the statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officers specified for that purpose in the statute, or any of their successors in office, as their true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate the firm shown in the schedule as the firm to whom the said officer is authorized to mail such process or a true copy thereof.

## XXVI. CHOICE OF LAW

Any dispute involving this Policy shall be resolved by applying the law of the state designated in the schedule.

---



**Policy Number:** QK1102774



The following clause(s) attach to and form part of the contract.

### PREMIUM PAYMENT WARRANTY

IT IS HEREBY WARRANTED that all premium due to Underwriters under this policy is paid within the amount of days as shown in the Schedule from inception.

Non-receipt by Underwriters of such premium, by midnight (local standard time) on the premium due date, shall render this policy void with effect from Inception.

All other provisions of the policy remain unchanged.

623AFB00082

179PR

---

Policy Number: QK1102774 

---

**U.S.A.**

**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD)**
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:-

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classification to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy*

does not apply:-

I.  Under any Liability Coverage, to injury, sickness, disease, death or destruction

(a)  with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:

---



Policy Number: QK1102774



"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a)     any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

*NOTE:-     As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

**17/3/60**

N.M.A 1256

100XX

---

AFB
2623
623

**Policy Number:** QK1102774



**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT**
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**13/2/64**
N.M.A. 1477

Policy Number: QK1102774



WAR AND CIVIL WAR EXCLUSION CLAUSE

(Approved by Lloyd's Underwriters' Non-Marine Association)

Notwithstanding anything to the contrary contained herein this Policy does not cover Loss or Damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalisation or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

1/1/38
068EA/NMA464

**Policy Number:** QK1102774



## REIMBURSEMENT FOR SERVICE CREDITS ENDORSEMENT

In consideration of the premium charged for the Policy, it is hereby understood and agreed that notwithstanding any other provisions of this Policy, the Underwriters may reimburse the **Insured** for the dollar amount cost of providing services and product sold for any service credits the **Insured** provides to its clients as part of a settlement of any otherwise covered **Claim** in lieu of or in addition to monetary **Damages** and such service credits shall be considered **Damages** under this Policy, provided that each of the conditions set forth below has been satisfied in connection with such **Claim**:

1.    the dollar amount cost of the service credits does not exceed the amount for which the **Insured** would have been liable in the absence of such settlement;

2.    each and every claimant has suffered a proven financial loss;

3.    the entire **Claim** is settled and each and every claimant involved in the settlement of such **Claim** signs a written release discharging the Underwriters from any and all liability arising out of such **Claim**; and

4.    the applicable Limit of Liability has not otherwise been exhausted by payment of **Damages** and/or **Claims Expenses**.

It is further understood and agreed that the amount reimbursed by the Underwriters to the **Insured** for such service credits shall be in excess of the Deductible and reduce the applicable Limit of Liability.

All other terms and conditions of this Policy remain unchanged.

**Policy Number: QK1102774**



## SPECIAL CANCELLATION CLAUSE

In consideration of the premium charged for the Policy, it is hereby understood and agreed that, notwithstanding anything to the contrary in this Policy including any endorsement or amendatory thereto, in the event the Underwriter:

1.  ceases underwriting; or

2.  is the subject of an order or resolution for winding up or formally propose a scheme of arrangement, or is placed into rehabilitation or liquidation by any state department of insurance; or

3   has its authority or license to carry on insurance business withdrawn; or

4   Lloyd's financial strength rating is issued below A- by A.M. Best Co or by Standard & Poor's Rating Services

the **Insured** may cancel this Policy by giving notice and the return premium shall be calculated on a pro rata basis to the time on risk.  Any return of premium shall also be subject to a written full release of liability from the **Insured**.  In the event there are any notified, reserved or paid claims, losses or circumstances, this endorsement shall not apply.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Policy Number:** QK1102774



## <u>SANCTION LIMITATION AND EXCLUSION CLAUSE</u>

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

All other terms and conditions of this Policy remain unchanged.

**Policy Number:** QK1102774



### BROKER REMUNERATION & DEDUCTIONS

**FEE/BROKERAGE:**           **Fee Payable by Client:** Yes (U.S.A.)

**Retail and/or Wholesale Brokerage:** 7.5%

**AON CARRIER CHARGE:**       Aon Limited performs various functions directly necessitated by the placement of international subscription market business which would otherwise have to be undertaken by carriers in order to enter into contracts of (re)insurance. These (re)insurance related functions include without limitation placement related administration, product distribution, premium tax and technical accounting. Aon Limited is compensated in respect of the above by levying the Aon Carrier Charge on Carriers which, for calculation purposes, shall be equivalent to 3.5% of all slip premiums in addition to brokerage.

**OTHER DEDUCTIONS**         None
**FROM PREMIUM:**

Policy Number: QK1102774



### Schedule A - Taxes payable by the Insured (Policy Holder) to Insurers
### Subject to Insurers Agreement to settle taxes onwards (as detailed in Insurer Agreement Schedule in respect of Schedule A herein)

| Policy No: | QK1102774 | | Gross Premium: | 540,000.00 |
|---|---|---|---|---|

**EU**

| Country | Allocation Basis | Inc. | Allocation % | Proportion of Premium | Rate of Tax | Tax amount |
|---|---|---|---|---|---|---|
| Belgium | 1,684,743 | T | 0.076% | 412.90 | 9.25% | 37.96 |
| Denmark (Non Lloyds) | 2,832,787 | TI | 0.129% | 694.26 | 14.00% | 0.00 |
| France | 4,149,697 | T | 0.188% | 1,017.01 | 9.00% | 91.37 |
| Germany | 1,448,315 | T | 0.066% | 354.95 | 19.00% | 67.72 |
| Hungary | 181,014 | NT | 0.008% | 44.36 | 0.00% | 0.00 |
| Netherlands Post 1st Mar | 5,327,197 | T | 0.242% | 1,305.59 | 9.70% | 126.76 |
| Portugal | 159,526 | T | 0.007% | 39.10 | 9.00% | 3.40 |
| Spain | 955,376 | T | 0.043% | 234.14 | 6.15% | 14.28 |
| UK (Elsewhere) 6% | 143,974,852 | T | 6.534% | 35,285.33 | 6.00% | De minimus |
| **EU Total** | **160,713,507** | | **7.294%** | **39,387.63** | | **2,556.03** |

**Rest of the World**

| Country | Allocation Basis | Inc. | Allocation % | Proportion of Premium | Rate of Tax | Tax amount |
|---|---|---|---|---|---|---|
| Argentina | 75,029 | O | 0.003% | 18.39 | 0.00% | 0.00 |
| Canada (British Columbia) | 1,056,857 | O | 0.048% | 259.01 | 0.00% | 0.00 |
| Canada (Manitoba) | 2,355,054 | O | 0.107% | 577.18 | 0.00% | 0.00 |
| Canada (Newfoundland) | 13,379,577 | O | 0.607% | 3,279.06 | 0.00% | 0.00 |
| Canada (Nova Scotia) | 57,804,186 | O | 2.623% | 14,166.64 | 0.00% | 0.00 |
| Canada (Ontario) | 33,660,406 | T | 1.528% | 8,249.49 | 8.00% | 660.10 |
| China | 5,436,280 | O | 0.247% | 1,332.32 | 0.00% | 0.00 |
| Colombia | 777,408 | O | 0.035% | 190.53 | 0.00% | 0.00 |
| Israel | 12,348,777 | NT | 0.560% | 3,026.44 | 0.00% | 0.00 |
| Singapore | 16,931,654 | NT | 0.768% | 4,149.61 | 0.00% | 0.00 |
| USA (Others) | 1,270,499,079 | T | 57.662% | 311,373.64 | 0.00% | 0.00 |
| **ROW Total** | **1,414,324,307** | | **64.189%** | **346,622.30** | | **660.10** |

| **TOTAL SCHEDULE A** | **1,575,037,814** | | **71.483%** | **386,009.93** | | **3,216.12** |
|---|---|---|---|---|---|---|

*Insurers Agreement Schedule in respect of Schedule A:*

| *Insurers to indicate below which Insurance Premium Taxes WILL be settled by Insurers.* | | | |
|---|---|---|---|
| *INSURER:* | *EU ONLY* | *WORLDWIDE* | *OTHER* |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



Policy Number: QK1102774



*Lloyd's Tax settlement mechanisms are already known and this section need not be completed by any Syndicate.*
*Any Insurers not listed above are deemed to be settling all taxes*

*Where an Insurer has indicated they will not settle specific premium taxes, the Insured should approach the relevant tax authority*
*directly to pay the premium tax with a full explanation of the circumstances.*
*It is strongly advised that the Insured seeks formal advice from their in-house or external legal or tax advisors.*

## Schedule B - Taxes payable by the Insured (Policy Holder) to Local Tax Authorities
**The taxes noted in Schedule B are for information & reporting purposes only and will not be collected/settled by Insurers.**
**It is strongly advised that the Insured seeks formal advice from their in-house or external legal or tax advisors.**

| Policy No: | QK1102774 | | Gross Premium: | 540,000.00 |
|---|---|---|---|---|

| Country | Allocation Basis | Inc. | Allocation % | Proportion of Premium | Rate of Tax | Tax amount |
|---|---|---|---|---|---|---|
| Australia (NSW) | 5,322,061 | O | 0.242% | 1,304.33 | 9.00% | 117.61 |
| Canada (Excise Tax) | 108,256,080 | O | 4.913% | 26,531.38 | 10.00% | 2,653.02 |
| Denmark (Lloyds) | 2,832,787 | NT | 0.129% | 694.26 | 0.00% | 0.00 |
| Thailand | 13,498,538 | O | 0.613% | 3,308.22 | 0.50% | 16.55 |
| Total Schedule B | 129,909,466 | | 5.896% | 31,838.18 | | 2,787.18 |

## Schedule C - No taxes payable and no reporting requirements.

| Policy No: | QK1102774 | | Gross Premium: | 540,000.00 |
|---|---|---|---|---|

| Country | Allocation Basis | Inc. | Allocation % | Proportion of Premium | Rate of Tax | Tax amount |
|---|---|---|---|---|---|---|
| Costa Rica | 28,870,274 | O | 1.310% | 7,075.52 | 0.00% | 0.00 |
| Egypt | 957,432 | O | 0.043% | 234.65 | 0.00% | 0.00 |
| India | 169,729,624 | O | 7.703% | 41,597.30 | 0.00% | 0.00 |
| Indonesia | 2,381,072 | O | 0.108% | 583.55 | 0.00% | 0.00 |
| Malaysia | 28,380 | O | 0.001% | 6.96 | 0.00% | 0.00 |
| Philippines | 385,160,658 | O | 17.481% | 94,395.09 | 0.00% | 0.00 |
| South Korea | 9,592 | O | 0.000% | 2.35 | 0.00% | 0.00 |
| Taiwan | 29,849 | O | 0.001% | 7.32 | 0.00% | 0.00 |
| United Arab Emirates | 1,191,628 | O | 0.054% | 292.04 | 0.00% | 0.00 |
| Various Unspecified | 34,843 | T | 0.002% | 8.54 | 0.00% | 0.00 |
| Total Schedule C (Others - no reporting requirements) | 588,393,352 | | 26.704% | 144,203.32 | | 0.00 |

## Schedule D - Taxes payable by Insurers to the Insured (Policyholder)
**Subject to Insurers Agreement for taxes to be deducted (as detailed in Insurer Agreement Schedule in respect of Schedule D herein)**

| Policy No: | QK1102774 | | Gross Premium: | 540,000.00 |
|---|---|---|---|---|



Policy Number: QK1102774



| Country | Allocation Basis | Inc. | Allocation % | Proportion of Premium | Rate of Tax | Tax amount |
|---|---|---|---|---|---|---|
| Australia Income Tax (XIS) | 5,322,061 | TI | 0.242% | 1,304.33 | -3.00% | -39.20 |
| Total Schedule D | 5,322,061 | | 0.242% | 1,304.33 | | -39.20 |

### Insurers Agreement Schedule in respect of Schedule D:

*Tax amounts shown above will be deducted from the Insurers net premiums and credited to the Insured, OTHER THAN for the Insurers & Countries specified below:*
*If Insurers choose that taxes are not deducted it is the responsibility of the Insurer to ensure these are accounted to the appropriate tax authority.*

| INSURER: | COUNTRY(IES) WHERE TAX NOT TO BE DEDUCTED |
|---|---|
| | |
| | |
| | |
| | |
| | |

*Lloyd's Tax settlement mechanisms are already known and this section need not be completed by any Syndicate*

*It is strongly advised that the Insured seeks formal advice from their in-house or external legal or tax advisors.*

### Schedule E - Taxes payable by the Insurers to Local Tax Authorities
### The taxes noted in Schedule E are for information & reporting purposes only and will not be deducted from premiums or administered by Aon Limited or the Insured (Policyholder).

| Policy No: | QK1102774 | | Gross Premium: | 540,000.00 |
|---|---|---|---|---|

| Country | Allocation Basis | Inc. | Allocation % | Proportion of Premium | Rate of Tax | Tax amount |
|---|---|---|---|---|---|---|
| Australia (Llds & Non XIS) | 5,322,061 | NT | 0.242% | 1,304.33 | -7.00% | 0.00 |
| Brazil (Licenced Insurers) | 21,112,340 | O | 0.958% | 5,174.21 | -7.00% | -362.12 |
| Canada (Income Tax) | 108,256,080 | O | 4.913% | 26,531.38 | -3.00% | -795.91 |
| Total Schedule E | 134,690,481 | | 6.113% | 33,009.91 | | -1,158.03 |

| | Total Allocation | Allocation % | Total Premium | | Total Tax Amount |
|---|---|---|---|---|---|
| OVERALL TOTALS | 2,203,364,105 | 100.000% | 540,000.00 | | 2,988.16 |

### FOREIGN DIRECT INSURANCE LEGISLATION - PREMIUM SPLIT

This is AON Ltd's proposed apportionment of Premium only, calculated on a pro rata basis, and utilising rates that AON Ltd believe to be correct as at the date of issue of the document version.

The purpose of this document is to assist Underwriters in establishing an apportionment of Premium for taxation and legislative reporting purposes.

**Policy Number:** QK1102774



This procedure in no way changes Underwriters responsibilities for making this calculation and/or ensuring that the correct tax rates are applied.

**PLEASE REMEMBER THAT TAX RATES AND SETTLEMENT PROCEDURES WILL CHANGE IF THERE IS A LOCAL BROKER INVOLVED IN ANY OF THESE TERRITORIES**

Note (1) - where tax percentage is 0, it means de minimis provisions have been applied.
Note (2) - Kentucky locations are always written on a Licensed basis by Lloyds.
Note (3) - Iceland Stamp Duty not payable on Renewal Business - new business only.

**Bureaux Information**
Ireland New or Renewal

**Policy Number:** QK1102774



## SECURITY DETAILS

**INSURER'S
LIABILITY:**

**LMA3333**
**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

**Policy Number:** QK1102774



Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:** 100% of 100%

**BASIS OF WRITTEN LINES:** Percentage of whole

**BASIS OF SIGNED LINES:** Percentage of whole

**SIGNING PROVISIONS:** Where the written lines hereon exceed 100% of the order, any lines written "to stand" are allocated in full and all other lines are signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the insurers.

However:
a) in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date are signed in full;
b) the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the insured and all insurers whose lines are to be varied. The variation to the contracts will take effect only when all such insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

**WRITTEN LINES:**

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the lead (re)insurer.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement."





---

Market Submission - Underwriter Signing Page            Page 48 of 48            BA 27/07/11 02



823
AON

### CONTRACT ENDORSEMENT

Unique Market Reference:     B0823QK1102774

Endorsement Reference:       1

Original Insured:            CONVERGYS CORP

Period:                      01 Aug 2011 to 01 Aug 2012

---

### CONTRACT CHANGES

With effect from 1st August, 2011 the Surplus Lines filing details are as follows:

State of filing: Ohio
SL Broker: Aon Risk Services, 1000 North Milwaukee Avenue, Glenview, IL  60025 USA.
License No: 31073

All other terms and conditions remain unchanged

---

### AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | | | | |
|---|---|---|---|---|---|
| Each Underwriter's proportion is several not joint | | | | | |
| Slip Leader Only | | Slip Leader and Agreement Parties | | All Underwriters | |
| 02 08 11 | | | | | |
| | | | | | |
| date | date | date | date | date | date |
| insurer | insurer | insurer | insurer | insurer | insurer |



823
AON

### CONTRACT ENDORSEMENT

Unique Market Reference:   B0823QK1102774

Endorsement Reference:   2

Original Insured:   CONVERGYS CORP

Period:   01 Aug 2011 to 01 Aug 2012

---

### CONTRACT CHANGES

With effect from 1ˢᵗ August, 2011 this contract is amended as follows:

Fiscal & Regulatory section amended to add;

Canadian Broker
Aon Reed Stenhouse Inc
20 Bay Street
Toronto
Ontario M5J 2N9
Canada

All other terms and conditions remain unchanged

### AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader and Agreement Parties | All Underwriters |
| A 1 9 B 11 | | |

---

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NICHOLAS MARTIN on behalf of himself and others similarly situated, | ) ) ) 1:11-cv-215 |
|     Plaintiff, | ) |
|         v. | ) ) |
| DUN & BRADSTREET, INC., and CONVERGYS CUSTOMER MANAGEMENT GROUP, INC. | ) ) JURY DEMANDED ) |
|     Defendants. | |

**COMPLAINT**

**CLASS ACTION**

1.     Plaintiff Nicholas Martin brings this action against Dun & Bradstreet, Inc. ("D&B")
and Convergys Customer Management Group, Inc. ("Convergys") to secure redress for violation
of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") arising out of improper
and unsolicited autodialed calls to plaintiff's cellular telephone.

**JURISDICTION AND VENUE**

2.     The Court has federal question jurisdiction over these TCPA claims.  *Brill v.
Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005).  If *Brill* were to be abrogated or
overruled, there is also CAFA jurisdiction because at least one class member is a citizen of a
state different than that of a defendant, and the amount in controversy is more than
$5,000,000.

3.     Venue is proper because a substantial portion of the events complained of
occurred in this District.

<u>**PARTIES**</u>

4.      Plaintiff is an individual who resides in this District.   Plaintiff's cellular telephone number is 630-xxx-3271. This number is on the FTC do not call list.

5.      D&B is a Delaware corporation that does business in this District. It has a local office in Naperville, Illinois. Its registered agent here is CT Corporation System, 208 S. LaSalle St, Suite 814, Chicago, IL 60604.

6.      Convergys is an Ohio corporation, with its headquarters in Cincinnati, Ohio. It does business in Illinois, and its registered agent here is CT Corporation System, 208 S. LaSalle St, Suite 814, Chicago, IL 60604.

<u>**FACTS**</u>

7.      The TCPA prohibits the use of "automatic telephone dialing systems" to call cellular telephones.

8.      "Automatic telephone dialing system" means any equipment that has the "*capacity* to dial numbers without human intervention."  *Griffith v. Consumer Portfolio Serv., Inc.*, 2011 WL 3609012 (N.D.Ill. Aug. 16, 2011)(emphasis original).

9.      Defendant Convergys used an automatic telephone dialing system to call plaintiff and the class.

10.      Upon information and belief, the calls to plaintiff and the class were made on behalf of and with the authorization of defendant D&B.

# COUNT I – TCPA

11.      Plaintiff incorporates all previous paragraphs of this complaint.

12.     It is a violation of the TCPA, 47 U.S.C. §227(b) to call a person's cellular telephone using an automatic telephone dialing system.

13.     Plaintiff and the class are entitled to have their rights, status and legal relations under the TCPA relating to defendant's calling of cell phones using an automatic dialing system.

14.     The defendant's calls were negligent, or alternatively, they were willful.   47 U.S.C. §312(f)(1).

## Class Allegations

15.     Plaintiff brings Count I on behalf of a class, which consists of:

All persons nationwide who defendant or some person on its behalf called on their cell phone using a device that has the capacity to dial numbers without human intervention, where defendant obtained the phone number from some source other than directly from the called party, where any call was made between and including a date two years prior to the filing of this action, ongoing.

16.     Upon information and belief, based upon industry practices, defendant called more than 100 cell phone numbers during 2011, where defendant obtained the cell phone number through some place other than from the recipient.

17.     Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting any individual member of the class, including plaintiff. Such questions common to the Class include, but are not limited to:

      a.     Whether defendants used an automatic telephone dialing system as that term us defined in the TCPA and applicable FCC regulations and orders; and

      b.     Damages, including whether the violation was willful.

18.     Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing

his claims vigorously, and has retained counsel competent and experienced in class and complex litigation.

19.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

20.     No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

21.     Defendant has acted on grounds generally applicable to the class, thereby making relief appropriate with respect to the class as a whole.  Prosecution of separate actions by individual members of the class, should they realize their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

22.     The identity of the class is likely readily identifiable from defendant's records.

23.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of himself and the class and against defendants that provides the following relief:

      a.     Statutory damages of $500 per violation, and up to $1,500 per violation if proven to be willful;

b.      A permanent injunction prohibiting defendant from violating the TCPA in the future through calling cellular phones using an automatic telephone dialing system and/or a prerecorded voice message;

c.      A declaration that defendants, and each of them, used an automatic telephone dialing system, and violated the TCPA in calling plaintiff and the class; and

d.      Any other relief the Court finds just and proper.

Respectfully submitted,

 Alexander H. Burke

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

**JURY DEMAND**

Plaintiff demands trial by jury.

Alexander H. Burke

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com

<u>**DOCUMENT PRESERVATION DEMAND**</u>

Plaintiff hereby demands that the defendant take affirmative steps to preserve all recordings, data, emails, recordings, phone records, dialer records, documents and all other tangible things that relate to the allegations herein, plaintiff or the putative class members, or the making of telephone calls, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with plaintiff or the putative class members, and any account or number or symbol relating to any of them. These materials are very likely relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody or control of any such materials, plaintiff demands that defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

<u>/s/Alexander H. Burke</u>